NO. 4:09-CV-00204

---

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

SHARON STARR,

Plaintiff,

v.

PIERCE FINLAY,
OCEANEERING INTERNATIONAL, INC.

Defendants.

---

OPPOSITION BY PLAINTIFF TO THE MOTION BY DEFENDANTS
FOR SUMMARY JUDGMENT
[RELATES TO DOCKET 23]

---

Matthew Paul Nickson
Texas Bar No. 24056043
S.D. Tex No. 704796
1300 McGowen
Houston, Texas  77004
Tel.: (713) 655-8880
Fax: (713) 655-0405
*Attorney-in-Charge for Plaintiff*

NO. 4:09-CV-00204

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHARON STARR,

                                          Plaintiff,

v.

PIERCE FINLAY,
OCEANEERING INTERNATIONAL, INC.

                                          Defendants.

OPPOSITION BY PLAINTIFF TO THE MOTION BY DEFENDANTS
FOR SUMMARY JUDGMENT

STATEMENT REGARDING ORAL ARGUMENT

The Plaintiff, Sharon Starr, respectfully requests that this summary judgment matter be called for oral argument.  This case implicates important legal controversy attending the construction and application of federal civil rights laws.

Counsel respectfully notes that he plans to be in Egypt between Christmas Day and January 4, 2010.  Counsel respectfully requests that any oral hearing on this motion be set for after January 4, 2010.

TABLE OF CONTENTS

Page:

STATEMENT REGARDING ORAL ARGUMENT..........................................................ii

TABLE OF CONTENTS.............................................................................................iii

TABLE OF AUTHORITIES ...................................................................................... iv

STATEMENT OF FACTS ...........................................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .................................................3

SUMMARY OF ARGUMENT ......................................................................................4

REASONS FOR DISALLOWING THE MOTION............................................................5

    A.  The Plaintiff's FMLA Claim Is Viable .............................................................5

        1.  Synopsis ...........................................................................................5

        2.  Because the Defendants demoted the Plaintiff on April
             21, 2008, the Plaintiff was under no duty to ever return
             to work for Defendants. ......................................................................6

        3.  The evidence supports the Plaintiff's argument that the
             Defendants' reason for eliminating her position is pre-
             textual, and that Defendants delayed the Plaintiff's
             demotion so as to circumvent the FMLA ...........................................11

             (i)  Defendants' "cost-cutting reorganization" is a
                  chimera....................................................................................11

             (ii)  Defendants schemed in order to defeat FMLA
                  liability ...................................................................................15

        4.  The Defendants' demotion of the Plaintiff was not a
             mere *de minimis* interference with her FMLA-protected
             rights ...............................................................................................19

    B.  The Plaintiff's Title VII Claim Is Viable.........................................................21

    C.  The Plaintiff's Retaliation Claims Are Viable..................................................24

Page:

    D. The Court Should Not Decree that Plaintiff Has Failed to Mitigate Her Damages ....................................................................................25

CONCLUSION AND PRAYER ....................................................................................25

CERTIFICATE OF SERVICE ....................................................................................27

TABLE OF AUTHORITIES

Federal Cases:                                      Page:

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)..................................................4, 19

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
    531 U.S. 288 (2001)..................................................................18–19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................4

*Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331
    (1945)..............................................................................................18

*Downey v. Strain*, 510 F.3d 534 (5th Cir. 2007)...............................................11

*Evans v. City of Houston*, 246 F.3d 344 (5th Cir. 2001).....................................24

*Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978)..............................21

*Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757 (5th Cir. 2001)...............7, 9–11

*Lafata v. Church of Christ Home for the Aged*, 325 Fed.Appx. 416 (6th
    Cir. 2009) (not selected for publication)...................................................9

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) .............................12

*Lusk v. Foxmeyer Health Corp., Inc.*, 129 F.3d 773 (5th Cir. 1997)................18

*Mauder v. Metropolitan Transit Authority of Harris County,* Texas, 446
    F.3d 574 (5th Cir.), *certiorari denied*, 127 S.Ct. 230 (2006)..................4

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ................................21

*Minard v. ITC Deltacom Communications, Inc.*, 447 F.3d 352 (5th Cir.
    2006) ...........................................................................................4, 19

*Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72 (3d Cir. 2003), *certiorari
    denied*, 541 U.S. 959 (2004) ...........................................................18, 19

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) ...................10–11

*Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463 (5th Cir. 2002)..........................24

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)..................................4

Federal Cases:            Page:

*Spears v. UTI Patterson Drilling Co.*, 2009 WL 2134601 (5th Cir. 2009)
  (not selected for publication) ...............................................................22

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)......................................4

*Throneberry v. McGhee Desha County Hospital*, 403 F.3d 972 (8th Cir.
  2005) ........................................................................................................19


Federal Codified Statutes:         Page:

28 U.S.C., FED. R. EVID. R. 402.........................................................................14

28 U.S.C., FED. R. EVID. R. 803.........................................................................14

29 U.S.C. § 630...................................................................................................18

29 U.S.C. § 2601, et seq.............................................................................. passim

29 U.S.C. § 2614............................................................................................6, 19

29 U.S.C. § 2615............................................................................................6, 10

42 U.S.C. § 1981.................................................................................................24

42 U.S.C. § 1983.................................................................................................18

42 U.S.C. § 2000, et seq.....................................................................................21

42 U.S.C. § 2000e-2............................................................................................21


Federal Regulations:           Page:

29 C.F.R. § 825.215............................................................................................20

29 C.F.R. § 825.216...................................................................................... passim


Federal Rules of Court:          Page:

FED. R. CIV. PRO. R. 50 .....................................................................................24

FED. R. CIV. PRO. R. 56 .....................................................................................12

Other Sources:                                                      Page:

MUELLER AND KIRKPATRICK, FEDERAL EVIDENCE (3d 2007 & Supp. 2009) ...................25

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW SHARON STARR, the Plaintiff in the above-styled and numbered cause of action ("Plaintiff," or "Sharon"), by and through her counsel of record, Matthew Paul Nickson, and hereby opposes the Defendants' motion for summary judgment, and would respectfully show unto the Court as follows:

## STATEMENT OF FACTS

The Plaintiff was hired by Defendants about 2005 to serve as a data processing clerk.  Ex. A, Starr dep., at pp. 12:10, 13:5.  As Defendants concede, Oceaneering "regarded Plaintiff as a valued employee and, based on her performance, OII [Oceaneering] promoted Plaintiff three times while she worked under Mr. Finlay's supervision."  Def. motion, at p. 2, para. 3.  On October 16, 2006, Oceaneering promoted Plaintiff to the position of data processing manager.  *Id.*, at p. 3, para. 3.  In this capacity, Plaintiff earned an annual salary of approximately $55,000.00.  Ex. A, Starr dep., at p. 26:15–17.[1]

In early 2007, the Plaintiff's relationship with Defendant Pierce Finlay, her supervisor, took a turn for the worse.  According to Plaintiff, Mr. Finlay adopted a hectoring attitude towards her and towards his other employees.  He cursed frequently. *See* Ex. A, Starr dep., at pp. 51–52.  He called another female employee a c--- to her face. *See id.*, at p. 43:5.  Plaintiff complained to supervisor Trent Loney about Mr. Finlay's cursing, and, according to Plaintiff, Mr. Loney responded: "Well, you know, he's Irish and sometimes, you know, it just . . . it just comes out that way."  *See id.*, at pp. 51:24–52:6 (internal quotation marks omitted).

---

[1]    By contrast, when she first began working for the company, Plaintiff earned a wage of $14.00 per hour.  *See* Def. ex. A.  Plaintiff incorporates all annexed summary judgment evidence by reference, as if fully set forth verbatim herein.

On January 30, 2007, Mr. Finlay sent the Plaintiff and others an e-mail featuring a picture of President George W. Bush, superimposed atop a condom, with lewd commentary alluding to the war in Iraq.  *See* Def. Ex. I.  Plaintiff testified that she was offended by the e-mail.  *See* Ex. A, Starr dep., at pp. 68:22–72:2.  When asked about the e-mail in his deposition, Mr. Finlay was nonchalant.  "I wouldn't call it a bad joke," he said.  *See* Ex. B, Finlay dep., at p. 62:7.

Plaintiff became pregnant in summer 2007.  When she told Mr. Finlay about her pregnancy, he reportedly told her that it "Sucks for you."  *See* Ex. A, Starr dep., at pp. 53:21–55:23.[2]  Sharon testified that Mr. Finlay's attitude towards her worsened after she told him that she was pregnant.  *Id.*, at p. 178:1–8.  One time, for example, Mr. Finlay told Sharon that she did not know a damn thing.  *Id.*, at p. 79:5–20.  Sharon was very upset about this, and she reported the problem to Human Resources (the Plaintiff did ask that the matter remain confidential, an understandable request for any employee who fears retaliation).[3]  *See id.*, at pp. 45:21–46:14.

Sharon also testified that Mr. Finlay called her into his office and told her "<u>not to fill out any paperwork, FMLA paperwork</u>" because he and his superior had arranged for Sharon to receive paid maternity leave.  *See* Ex. A, Starr dep., at p. 58:13–19 (emphasis

---

[2]     Mr. Finlay testified that he replied, "Good luck with that."  *See* Ex. B, Finlay dep., at p. 21:18–19.  He testified that he later apologized because his daughters remarked to him that the comment was "a bit mean."  *Id.* at p. 22:12–20.

    Defendants' counsel attempted to downplay the significance of Mr. Finlay's alleged comment by alluding to the struggles of child-rearing.  Ex. A, Starr dep., at p. 55:5–8 ("And so it's possible that he just meant that like, whoa, you've already got two older kids, now you're going to have this younger kid, that's going to be tough.").

[3]     Plaintiff testified: "That's just the way Pierce is.  If he knew that someone was saying anything against him, then he would retaliate against that person."  *See* Ex. A, Starr dep., at p. 51:8–10.  Plaintiff testified that Mr. Finlay had become increasingly rude towards an inspector who had reported a problem with him to her.  *See id.*, at pp. 51:11–52:2.

added).   But as Mr. Finlay's relationship with Sharon continued to deteriorate, he changed his mind; she was not paid for her leave.  *See id.*, at pp. 86:2–87:23.

On April 21, 2008, Sharon received an e-mail from Pierce Finlay.  *See* Ex. C (Def. ex. S).  The e-mail instructed Sharon and other employees to report to Brent Fraser, their new supervisor.  *See id.*  When Sharon returned to work on June 11, 2008, she was informed by Mr. Finlay—and later by Ms. Julie Hardaway, Oceaneering's Human Resources Administrator—that her position had been eliminated and that the company would offer her a post as a data entry clerk, paying about $18.00 per hour.  *See* Def. motion, at pp. 8–9, para. 15.

Plaintiff never accepted the new position; she went back onto an approved, extended leave of absence and never returned.  *See id.*, at p. 9, para. 16.  She was terminated about December 22, 2008.  *See id.*, at p. 9, para. 17.

<u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

The issues presented for review are whether the Plaintiff's FMLA, Title VII, and retaliation claims must be dismissed, as well as whether the Plaintiff should be adjudged, as a matter of law, to have failed to mitigate her front pay and back pay damages.

The Court should review all such issues within the general framework of Rule 56 of the Federal Rules of Civil Procedure.

Plaintiff agrees with Defendants' recitation of casuistic principles governing motions for summary judgment.  *See* Def. motion, at pp. 11–12, para. 21.  Plaintiff would emphasize, however, that Plaintiff's burden to produce admissible evidence in response to Defendants' motion, is solely triggered if and once the Court determines that Defendants have satisfied their initial responsibility of demonstrating sufficient grounds

for their belief that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Plaintiff's rebuttal burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

By contrast, in order to prevail upon their motion for summary judgment, and in addition to satisfying their burden of production, the Defendants are always under a "stringent" burden of persuasion. *See Celotex*, 477 U.S., at 330–331 (Brennan, J., dissenting) (citations to authorities omitted). In particular—with reference to Defendants' contention that, for FMLA purposes, the Plaintiff's position would have been eliminated regardless of whether the Plaintiff took FMLA leave, *see* Def. motion, at p. 16, para. 31—the Defendants bear the burden of proof. *Accord* 29 C.F.R. § 825.216(a)(1); *Mauder v. Metropolitan Transit Authority of Harris County, Texas*, 446 F.3d 574, 583 (5th Cir.), *certiorari denied*, 127 S.Ct. 230 (2006).[4]

## SUMMARY OF ARGUMENT

In Part A, the Plaintiff would show the Court that her FMLA claim is viable because she was demoted during the period of her approved FMLA leave. Defendants' legal and factual excuses for their actions ring hollow, and are pre-textual. In light of factual issues surrounding the Defendants' timing of the Plaintiff's demotion, summary

---

[4]     The elements of a cause of action under both the Civil Rights Act of 1964 and under the Family and Medical Leave Act of 1993 go to the merits and should not be considered jurisdictional. *Cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006); *Minard v. ITC Deltacom Communications, Inc.*, 447 F.3d 352 (5th Cir. 2006). The significance of this observation is that the Court should resolve all inferences in respect of the establishment of all elements of the Plaintiff's causes of action in favor of the Plaintiff, the non-movant herein. That is, the Court need not, and ought not, conduct its own inquiry into jurisdictional facts.

judgment is inappropriate.  Moreover, the Plaintiff's demotion was not merely a *de minimis* recalibration of her responsibilities.

In Part B, the Plaintiff would show—partially for the same reasons as in Part A— that she has plead and proven a viable Title VII cause of action by establishing a prima facie case of pregnancy discrimination, and that the Defendants' justification for demoting her is pre-textual.

In Part C, the Plaintiff would show that she possesses a viable retaliation claim.

In Part D, the Plaintiff would show that the factual record does not support the entry of a judicial decree that she is ineligible for Title VII back pay and equitable front pay on account of her failure to mitigate her damages.

<u>REASONS FOR DISALLOWING THE MOTION</u>

<u>A.</u>      <u>The Plaintiff's FMLA Claim Is Viable.</u>

   *1.      Synopsis*

The Court should not dismiss the Plaintiff's claim for damages under the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq., as amended; Public Law 103-3, 107 Stat. 6.[5]  The Defendants contend that the Plaintiff's FMLA claim is unsustainable because: (1) the Plaintiff's managerial position would have been eliminated regardless of whether she had taken FMLA leave; (2) the Plaintiff did not return to work at the conclusion of her twelve weeks of leave; and, (3) the Defendants did not interfere with the Plaintiff's FMLA leave when the Defendants appointed a new supervisor over the Plaintiff and over the Plaintiff's employees on April 21, 2008.  In the alternative, Defendants contend: (4) that any interference with the Plaintiff's FMLA rights was *de*

---

[5]      The parties do not dispute that the Plaintiff went out on FMLA leave from March 11, 2008 until June 11, 2008; that the Plaintiff was eligible for the leave; and, that Defendant Oceaneering International, Inc., an eligible employer, approved the leave.  *See* Def. motion, at pp. 7–8.

*minimis*.  For three reasons, all of Defendants' arguments must be rejected.  First, the evidence supports the Plaintiff's contention that she was effectively demoted when she was assigned to a new supervisor on April 21, 2008, during her approved FMLA leave; and, that Plaintiff was made aware of the assignment by e-mail, thereby discharging her duty to return to work prior to the expiration of her leave.[6]  Second, the evidence also raises fact issues regarding whether the Defendants' excuses for eliminating the Plaintiff's position are pre-textual; as well as whether Defendants intentionally delayed the formal demotion of the Plaintiff until such time as would enable them to escape FMLA liability (a course of evasive conduct which this Court should not exonerate!) Third, the demotion of the Plaintiff was not *de minimis* because it veiled her fall from a salaried supervisor to a wage-earning data entry clerk.  Owing to these three considerations, which shall be explored in turn in subparts 2–4, *infra*, the Court must deny summary judgment upon the Plaintiff's FMLA claim.

> 2.  *Because the Defendants demoted the Plaintiff on April 21, 2008, the Plaintiff was under no duty to ever return to work for Defendants.*

From the evidence, a reasonable juror could conclude that the Plaintiff was demoted and replaced by Brent Fraser on April 21, 2008, *see* Ex. C; and, that Defendants purposefully delayed further confirmation of the demotion in order to avoid running afoul of the FMLA.  *Accord* Ex. B, Finlay depo., at pp. 34:2–35:1, 36:10–21.  The Defendants' de facto demotion of the Plaintiff while she was on leave, is sufficient to render the Plaintiff's FMLA claim legally cognizable—regardless of the date when the Plaintiff

---

[6]      The FMLA provides, in pertinent part and with an inapplicable exception (i.e., a different rule) for highly compensated employees, that "any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  The FMLA prevents all forms of interferences, restraints, and denials of leave rights (and the attempted exercise of the same).  *See id.*, at § 2615(a)(1).

actually returned to work.[7]   Therefore, summary judgment against the Plaintiff's FMLA claim is improper.[8]

Defendants are incorrect that Plaintiff forfeited her right to reinstatement, in a supervisory capacity, by failing to return to work twelve weeks after going out on leave. *See* Def. motion, at p. 17, paras. 32–33.  As aforementioned, the evidence raises a fact issue regarding whether the Defendants demoted the Plaintiff on April 21, 2008, when the Plaintiff had been away on leave for less than twelve weeks.  At that time, the Defendants informed the Plaintiff (and other employees) that Brent Fraser, another Oceaneering employee, would be assuming supervisory responsibility over the Plaintiff and over other employees who theretofore had been supervised by the Plaintiff.  *See* Ex. C; *see also* Ex. D, Fraser dep., at p. 11:17–18 ("I was told by Pierce that I was going to be given the responsibilities of looking after all Sharon's employees.").[9]  The ultimate significance of the e-mail was that Plaintiff "no longer had my job," *see* Ex. A, Starr depo., at p. 104:21–24;[10] that she had been removed as a supervisor effective

---

[7]     Also relevant to this analysis, and discussed in subpart 3, *infra*, is the Defendants' deliberate delay of the formalization of the Plaintiff's demotion, from January or February 2008 until June 2008.  *See* Ex. B, Finlay depo., at p. 33:3–5.

[8]     The Plaintiff's precise level of knowledge about what happened to her in April 2008, should be considered irrelevant to her interference claim, 29 U.S.C. § 2615(a)(1).  *See* Docket 18, at p. 4, para. 13. *Cf. Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 763–65 (5th Cir. 2001) (whether employee had knowledge is important for failure to reinstate claim).  This is especially so if one conceives of the FMLA as a legal codification of private contractual rights.  The material breach by the employer, regardless of how fully it is immediately appreciated, excuses contractual performance by the employee.  *Accord id.*, at 765 (employee's inability to return from work on time was irrelevant, where employer was unaware about it when he gave away her position).

[9]     Ms. Hardaway, the corporate human resources administrator for Defendant Oceaneering, testified that Plaintiff's job functions did not change in April 2008.  *See* Ex. E, Hardaway depo., at pp. 26:25–27:2. Ms. Hardaway did state, however, that Mr. Fraser was made a supervisor over "all the data processing clerks and seniors."  *Id.*, at p. 27:16–17.  A reasonable jury can certainly infer, from this adjustment of Mr. Fraser's duties, that he assumed Sharon's supervisory responsibilities in April 2008, and effectively displaced her (as a supervisor) at that time.

[10]    Plaintiff's testimony about exactly what she knew in April 2008 was somewhat unclear.  For example, she stated that "I did not know in April 21st that my job was no longer.  I just knew that I had a different supervisor."  *See* Ex. A, Starr depo., at p. 124:21–23.

immediately; and, no doubt, that additional changes to the Plaintiff's level of earnings, privileges, and responsibilities were imminent.  The Defendants appear to concede as much.  In their motion for summary judgment, Defendants state that Brent Fraser, the man who became the Plaintiff's supervisor in April 2008, assumed <u>the Plaintiff's</u> former supervisory responsibilities.  *See* Def. motion, at p. 13, para. 26 ("The record also reflects that no replacement was hired for Plaintiff **and her supervisory responsibilities were absorbed by the Operations Manager, Mr. Brent Fraser.**") (citation omitted) (emphasis added).

What's more, the Defendants cannot argue persuasively that the Court should accord dispositive significance to the formal elimination of the Plaintiff's job in June 2008.  The <u>Defendants' own company organizational chart, dated April 2008, demonstrates that Plaintiff was no longer a Data Processing Manager by said month—the Plaintiff does not appear named on the chart.</u>  *See* Ex. F, June 2008 Insp. Grp chart (Def. ex. Y); *but see* Def. motion, at p. 14, para. 27 ("Plaintiff erroneously believes that the Data Manager Position was eliminated in April 2008, but the summary judgment record conclusively establishes that the position was <u>officially</u> eliminated on June 11, 2008.") (citing Def. ex. K, Finlay depo., at p. 40:11–14) (emphasis added).[11]  By contrast, the Plaintiff does appear listed—at the same level as Brent Fraser—on the Defendants' October 2006 chart.  *See* Ex. G, October 2006 Insp. Grp chart (Def. ex. F).  Defendants' argument about the summary judgment record is not firmly grounded in the evidence.

---

[11]     On the basis of third-party hearsay evidence that is unaccompanied by a business records affidavit in any event, and to which objection is separately lodged and is hereby reurged, Defendants argue that, "[H]ad [the Plaintiff] been demoted prior to June 10, 2008, an adjustment to the amount of her disability payments would have been required and the amount of payments would have necessarily been reduced to reflect a new salary."  *See* Def. motion, at p. 14, para. 28 (citing Lincoln Financial Group correspondence). Should the Plaintiff's hearsay objection nonetheless be overruled, the Defendants' insurance evidence proves little.  The Defendants may have failed to adjust the Plaintiff's disability insurance payments prior to her return to work: (1) in order to evade FMLA liability, or (2) because they simply overlooked doing so.

Assuming therefore (as the Court must) that the Defendants actually did demote the Plaintiff in April 2008—by, without limitation, relieving her of her supervisory duties—the Defendants thereby violated the far-reaching proscription of 29 U.S.C. § 2615(a)(1).  Defendants' violation, which was communicated to the Plaintiff via e-mail (in the form of a notice about a new supervisor), must be understood as discharging Plaintiff's obligation to return timely from leave—especially since it cannot be denied that Plaintiff had no statutory duty to accept the position to which she had been demoted. *Cf. Lafata v. Church of Christ Home for the Aged*, 325 Fed.Appx. 416, 418–421 (6th Cir. 2009) (not selected for publication) (reversing a grant of summary judgment against an FMLA claimant, where the FMLA claimant had failed to return to work after holding a conversation with her supervisor while she was on leave, during which conversation the supervisor offered the claimant a new position which the claimant did not regard as equivalent to her prior position).  While there is little case law which directly addresses the question (of the discharge of the duty to return to work), the argument that Plaintiff had no statutory duty to return to work is supported by *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 75 (5th Cir. 2001).  *Hunt* featured an FMLA claim brought by a hospital nurse who argued that, upon returning (weeks late) from FMLA leave, she was not restored by her employer to an equivalent position.  *See id.*, at 762.  Though it was apparently undisputed that, while Hunt was on leave, her employer had given away her position to another employee, the parties "vigorously" disagreed about "whether Hunt attempted to return to work before December 12, 1997, the date the medical center designated in writing as the end of her FMLA leave."  *See id.*, at 761.

*Hunt* is favorable to the Plaintiff because, in reversing a grant of summary judgment disposing Hunt's FMLA claim, the Court posited that Hunt had created a genuine issue of material fact in respect of whether, prior to the expiration of her leave, Hunt had contacted her supervisor about returning to work in a timely fashion. *See id.*, at 764.  Hunt had testified that her supervisor had told her that her position had been filled, and that he had offered her alternative positions. *See id.*  The Court held that such evidence created a fact issue precluding summary judgment. *See id.*  Plaintiff herein interprets *Hunt* to support the proposition that an employee who learns, prior to the expiration of her FMLA leave, that her position has been eliminated, bears no duty—for purposes of enforcing FMLA rights—of returning to work before or upon the expiration of said leave.[12]  Plaintiff also believes that the Court should extend the rule of *Hunt* to embrace <u>constructive</u> (or judicially deemed) knowledge of a demotion or termination where, as here, the employee's apparent lack of actual knowledge is the intentional fault of the employer.[13]

---

[12]      Indeed, such a duty would be absurd.  If my employer calls me four weeks into my FMLA leave and tells me that he has replaced me with somebody who will work every weekday of the year, what is the point of my presenting at work on the date after my leave expired (but for my termination)?

The FMLA will sometimes permit an employer to discharge an employee while the employee is on leave. *See* 29 U.S.C. § 2615(b)(1).  Surely, an employee who feels, in such circumstances, that he or she was wrongfully discharged, is under no statutory or regulatory duty to make a pro forma attempt to return to work, either before or immediately following the expiration of FMLA leave.

[13]      If it is true that—prior to the expiration of her leave—the Plaintiff was in the dark about what had happened to her managerial position, this was attributable to Defendants, who had provided her with selective information about her reassignment. *See, e.g.*, Ex. C.  To punish the Plaintiff for not knowing until June that her job had been eliminated in April, is to reward the Defendants for hiding the fact that she had been demoted.  Such a course of action weakens the FMLA by rewarding evasion (as would a rule of law which dictated that, in all cases in which an employer demotes or terminates an employee *the day after* he returns from work, there is never FMLA liability).

The Plaintiff suffered prejudice as a result of the Defendants' failure to inform her in April 2008 about the indubitable implication of her assignment to a new supervisor. *Cf. Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002) ("By its nature, the remedy created by Congress [FMLA] requires the retrospective, case-by-case examination the Secretary seeks to eliminate.  The purpose of the cause of action is to permit a Court to inquire into matters such as whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions.  To determine whether damages and equitable relief are appropriate under the FMLA, the judge or jury must ask what steps the employee would have

3.  *The evidence supports the Plaintiff's argument that the Defendants' reason for eliminating her position is pre-textual, and that Defendants delayed the Plaintiff's demotion so as to circumvent the FMLA.*

(i)  Defendants' "cost-cutting reorganization" is a chimera.

Defendants' contention that Plaintiff's position "would have been eliminated regardless of whether Plaintiff had taken FMLA leave," *see* Def. motion, at p. 16, is pre-textual, unable to stand on its own in light of the contradictory and internally inconsistent testimony of Defendants' witnesses.  Specifically, (1) Defendants' witnesses were unable to agree on whether the Plaintiff's department had experienced a reorganization in April 2008; and, (2) Defendant Finlay provided incredible and/or unconvincing reasons for waiting until June 2008 to eliminate the Plaintiff's job position.  Accordingly, the Court must hold that genuine issues of material fact exist, surrounding the Defendants' satisfaction of their 29 C.F.R. § 825.216(a)(1) burden of proof.

As an initial matter, it is dispositive that Defendants lack admissible evidence in support of their assertion that "there was no 'equivalent position' as defined by the statute for Plaintiff to be placed in at OII in June 2008."  *See* Def. motion, at p. 16, para. 31 (citing Def. ex. N, Hardaway affidavit).  Defendants' evidence, the Hardaway affidavit, renders an inadmissible, conclusory opinion—without any mention of how the opinion is reached—about the putative absence of equivalent work at Oceaneering.  *Cf.* Def. ex. N, Hardaway aff., at para. 5 ("There were no positions at Oceaneering's Houston Division

---

taken had circumstances been different—considering, for example, when the employee would have returned to work after taking leave.").  The prejudice to the Plaintiff is that, had she known prior to the end of her leave that her position had been eliminated, she would have had no problem in enforcing her federally protected FMLA restoration right, because she would have been placed in the exact same position as the nurse in *Hunt*.  *Cf. Downey v. Strain*, 510 F.3d 534, 542 (5th Cir. 2007) (as to the application of FMLA regulations, *Hunt* must be interpreted in the light of *Ragsdale*).

As discussed in n. 8, *supra*, the Plaintiff's level of knowledge should be considered irrelevant as to her interference claim.  *See* Docket 18, at p. 4, para. 13 (setting forth interference and restoration-related FMLA causes of action).

that Ms. Starr qualified for that paid the same salary that she was paid as Data Processing Manager in June 2008."). The Court should exclude Hardaway's conclusion. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) ("The object of the provision [FED. R. CIV. PRO. R. 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.") (citations omitted). Thus, because they have no admissible proof, Defendants cannot satisfy their 29 C.F.R. § 825.216(a)(1) burden with respect to the question, whether an equivalent, supervisory position existed at Oceaneering, in which the Plaintiff could have been placed.

On the subject of the elimination of the Plaintiff's position, Plaintiff notes that Defendants' witnesses offered differing justifications for her demotion. While Defendants' counsel has previously represented to this Court that Plaintiff's position was eliminated as a function of an "April 2008" "reorganization" and of "cost-savings initiatives," *see* Docket 15, at p. 2, para. 15, *but see* Ex. L, Def. resp. to int. 4, at p. 5 (reorganization took place in <u>February</u>) (emphasis in document added), Mr. Finlay denied that a reorganization had even taken place (in his department). Mr. Finlay simply ascribed the elimination of the Plaintiff's position to cost-cutting:

> Q.   [MATTHEW NICKSON]   Did   Oceaneering   have   a reorganization in your department in early 2008?
> A.   [PIERCE FINLAY] Reorganization in my department?
> Q.   (Counsel nods head.)
> A.   No.
> Q.   Was there cost cutting in your department?
> A.   There was cost cutting companywide. We were all asked to cut costs.

Ex. B, Finlay depo., at pp. 29:24–30:6. For her part, Julie Hardaway, Defendant Oceaneering's corporate human resource administrator, testified that what happened in the Oceaneering Inspection Group in April 2008 was a "multiple reorganization." *See*

Ex. E, Hardaway depo., at p. 64:5–9.  She also characterized the Plaintiff's demotion as

flowing from a departmental "reconstruction":

> Q.     [MATTHEW NICKSON] Do you know if Sharon received a new
>        supervisor in April of 2008?
> A.     [JULIE HARDAWAY] Yes.
> Q.     Why did she get a new supervisor?
> A.     Because the whole department did a reconstruction and everyone
>        was moved to operations for reporting statuses.
> Q.     What do you mean by that?  Why did the department do a
>        reconstruction?
> A.     Prior to years prior, everyone fell under operations.  So, they
>        decided to move back to their prior business structure.
> Q.     Why did they make that decision?
>              MS. KING:    Objection, calls for speculation.
>              You can answer, if you know.
> A.     We would need to ask the VP and Pierce on that.

*Id.*, at p. 26:7–24.

Should this Court nevertheless be of the opinion that the above inconsistency

(between the Finlay and Hardaway depositions) is semantic, the Court should ponder Mr.

Finlay's testimony surrounding: (1) the scope of cost-cutting at Oceaneering; and, (2) the

basis for the Defendants' delay in demoting the Plaintiff.  Remarkably, although Mr.

Finlay insisted that the purported elimination of the Plaintiff's position was a function of

cost-cutting, and although he testified that he "cut[s] costs all the time," Mr. Finlay could

not specifically identify any major cost-cutting measures which he had undertaken in

2009:[14]

> Q.     [MATTHEW NICKSON] Since early 2008, have you done
>        anything else to cut costs at Oceaneering?
>        MR. STUART:      Objection, form.
> Q.     (BY MR. NICKSON)         You can answer.
> A.     [PIERCE FINLAY] I try and cut costs all the time, no matter what
>        it is.
> Q.     What about this year?

---

[14]    Mr. Finlay's deposition was taken on October 22, 2009.  *See* Ex. B, Finlay depo., at p. 1.

> A.    Same thing.  I'm always looking at some way of cost cutting. That's my job.
> Q.    Can you identify a specific action for me that you've taken this year to cut costs?
> A.    That's a good question.  I can't, really, except for the normal stuff.
> Q.    Have you eliminated any positions this year?
> A.    No.

Ex. B, Finlay depo., at pp. 43:23–44:12.  Furthermore, Defendants have scant—if any—admissible documentary evidence which bolsters their cost-cutting defenses.  This is a surprise; for, during Sharon's deposition, Defendants' counsel asked: "So if we're able to give your attorney—and we've actually already provided your attorney—e-mails that show that cost savings initiatives were implemented in January, February, March 2008, do you have any reason to believe that those aren't true?"  *See* Ex. A, Starr depo., at p. 139:13–17.[15]  Yet the only e-mails produced that remotely match counsel's description are the Frisbie and Collins e-mails.  *See* Def. ex. O.  These e-mails are objected to and inadmissible because: (1) they consist almost entirely of hearsay statements made by Dick Frisbie and Jay Collins, *see* FED. R. EVID. R. 402; and (2) they are unaccompanied by a business records affidavit, *see* FED. R. EVID. R. 803(6).

It is also worth mentioning that, while Defendants identified Mr. Rhadakrishnan Balan Nair as the only other employee whose transfer out of the Inspection Group was part and parcel of their the cost-cutting effort, *see* Ex. B, Finlay depo., at p. 31:13–32:4,[16] Mr. Nair actually testified that *he* approached Oceaneering about getting another, better

---

[15]     Implying that ample documentation existed which bolstered the cost-cutting defense, Defendants' counsel also asked the Plaintiff, somewhat rhetorically: "Do you think you got every e-mail that was ever sent at Oceaneering from every manager and director?"  *See* Ex. A, Starr depo., at p. 137:11–13.

[16]     Nevertheless, in a July 25, 2008 position letter to the Equal Employment Opportunity Commission, Defendants' counsel wrote that Plaintiff "was one of <u>a number</u> of employees affected by staffing changes implemented while she was on maternity leave."  *See* Ex. J, EEOC letter, at p. 4 (emphasis added).  "Like other employees," counsel wrote, "she was offered continued employment in a different capacity.  Unlike other employees, she was dissatisfied with her new position and has not performed the new position due to her ongoing medical leave."  *See id.*  Who were these other, phantom employees?  *Cf.* Ex. K, Def. resp. to int. 23, at p. 7 (naming Nair and Starr).

position—not vice versa.  *See* Ex. H, Nair depo., at p. 10:17–22.  A reasonable juror could certainly conclude that, despite Defendants' protestations to the contrary, Mr. Nair's position was not cost-cut at all.  Mr. Nair simply advanced himself.  *See id.*, at p. 10:24–25 ("I was looking for jobs because the current job, you know, I realized that I cannot have any more growth.").

(ii)     Defendants schemed in order to defeat FMLA liability.

The evidence of record suggests that, in holding off on "officially" terminating the Plaintiff until June 2008, Defendants schemed in order to destroy their FMLA liability.  The reasons given by Mr. Finlay for having waited until June 2008 are unworthy of credence:

Q.      [MATTHEW NICKSON] When did you make the decision to eliminate Sharon's position?
A.      [PIERCE FINLAY] I had made it in the January, February region. I'm not quite sure what month I decided.  It was right at the beginning of the year.
Q.      Okay.  When was her position actually eliminated?
A.      It was not eliminated until she came back from maternity leave.
Q.      Okay.  So in June?
A.      I believe – I don't know when she came back.  It was around June.
Q.      Why did you wait for her to come back?
A.      Because it was no point in eliminating her position while she was gone.  She was gone anyway, and things could have changed.  I mean, we could have had a turnaround.  We might have changed our mind.
Q.      You say a turnaround.  What do you mean by that?
A.      Well, we're – we work for oil companies.
Q.      Uh-huh.
A.      We inspect structures.  If there is an upturn in the year where there is hurricanes, there is extra inspections, and circumstances might have changed, we might have had a lot more work and we might have had to keep that position.
Q.      Was 2008 a good year for Oceaneering?
A.      As a whole, I'm not really sure.  I know in my division, it was, it was a good year.
Q.      What made it a good year in your division?
A.      Because we had a few hurricanes.

15

> Q. And could that create work in the latter half of the year?  Is that what you mean?
> A. Yeah.  It was a good year, so it was all hurricane work.
> Q. That came in the latter half of the year, right?
> A. Yes.  That was in late November.
> Q. But the first half of the year –
> A. It was our normal year.

Ex. B, Finlay depo., at pp. 33:1–35:1.

Mr. Finlay's testimony about an "upturn" or "turnaround" in the Inspection Division, flowing from hurricanes, is not a legitimate reason for waiting until early June to terminate the Plaintiff, given the commonly acknowledged rarity (about which the Court is invited to take judicial notice) of major May or June hurricanes in the Northern Hemisphere.[17]   Mr. Finlay's testimony about the need for "a turnaround" is also inconsistent with Oceaneering's Securities and Exchange Commission year 2008 second quarter 10-Q filing.  *See* Ex. I, SEC 10-Q filing, at p. 15 (printout p. 22 of 33).  Defendant Oceaneering's Form 10-Q report for the second quarter of 2008 (ending June 30, 2008) indicates that the company's Inspection Group enjoyed increases in revenues, gross margins, and operating income.  *See id.*[18]

Letting economic justifications aside, Mr. Finlay also testified that he did not demote Plaintiff until she returned from FMLA leave because he did not want to risk having "something happen[]."  *Compare* Ex. B, Finlay depo., at p. 36:10–21, *with id.*, at

---

[17]      The matter would perhaps be different if Mr. Finlay had testified that he waited until mid-September.

[18]      Oceaneering's Inspection Group revenue for the three months ending June 30, 2008 was reported at $67,969,000, as opposed to $59,551,000 for the three months ending March 31, 2008, and $55,417,000 for the three months ending June 30, 2007.  *See id.*  In the sixth months ending June 30, 2008, the Inspection Group generated $127,520,000 in revenues, as opposed to $102,837,000 in revenues during the sixth months ending June 30, 2007.  *See id.*  Gross margins also increased.  The Inspection Group earned $13,776,000 for the three months ending June 30, 2008, as opposed to $11,587,000 for the three months ending March 31, 2008, and $11,144,000 for the three months ending June 30, 2007.  *See id.*  During the sixth months ending June 30, 2008, Inspection Group gross margins stood at $25,363,000, as opposed to $17,826,000 during the sixth months ending June 30, 2007.  *See id.*  In sum, Oceaneering's own public filing, covering the second quarter of 2008, indicates that the first half of 2008 was profitable, *and an upturn*, for the company's Inspection Group.

pp. 33:1–35:1.  This divergence raises a specter of controversy in respect of whether the

Defendants: (1) knew that their demotion of the Plaintiff could cause legal problems; and

(2) attempted to time the demotion so as to avoid such problems.  Consider the following:

> Q.   [MATTHEW NICKSON] Okay.  So you said earlier that you may
> have made the decision to eliminate Sharon's position in
> January or February, is that right?
> A.   [PIERCE FINLAY] Yes.
> Q.   Was there a reason you didn't tell her then before she left on
> FMLA leave?
> A.   I was advised not to tell her.  When I made the decision, she had
> already come to me and said she was pregnant, and I was told,
> "Don't tell her that kind of stuff now.  What if it will upset her and
> <u>something happens</u>?"  And I said, "Well, we'll just leave it as it is,
> and I'll make the final decision when she comes back."
> Q.   Who told you not to tell her?
> A.   I was trying to remember that.  I'm not quite sure if it was either
> Andre [Olivier] or [Human Resources Administrator] Julie
> Hardaway.

*Id.*, at p. 36:10–21 (emphasis added).[19]  Mr. Finlay testified that it "didn't make any

difference" whether he demoted Sharon during or following her pregnancy.  *Id.*, at p.

37:1–3 ("It didn't make any difference whether I done it now or when she came back,

and I had a chance to change my mind, if I wanted.").  All in all, his testimony regarding

Sharon Starr's demotion cannot satisfy the Defendants' 29 C.F.R. § 825.216(a)(1)

burden.  On the contrary, Mr. Finlay's testimony about delaying the Plaintiff's demotion

could easily strike a juror as proof that he intentionally acted so as to escape running

afoul of the FMLA (just as Mr. Finlay's earlier testimony about cost-cutting could easily

strike a juror as concocted).

Because the evidence raises a fact issue whether the Defendants have acted in

order to defeat FMLA liability, the Court or the jury must place substance over naked and

---

[19]   Ms. Hardaway denied advising Mr. Finlay to wait until Sharon returned from leave before informing her that her position had been eliminated.  *See* Hardaway depo., at p. 40:9–21.

manipulable form in ascertaining the effective date of the Plaintiff's demotion. *See, e.g.*, *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 302 n.4 (2001) (noting, in applying/defining the parameters of the State action doctrine in the context of a 42 U.S.C. § 1983 lawsuit against an athletic association with ties to the State of Tennessee, that "if formalism were the sine qua non of state action, the doctrine would vanish owing to the ease and inevitability of its evasion, and for just that reason formalism has never been controlling"); *Lusk v. Foxmeyer Health Corp., Inc.*, 129 F.3d 773, 777 n.3 (5th Cir. 1997) (noting, in the context of an Age Discrimination in Employment Act lawsuit in which the appellants sought to pierce the corporate veil allegedly separating a parent corporation from its subsidiary, that, in order to aggregate the number of employees for purposes of the Act's definition of a covered employer, 29 U.S.C. § 630(b), "Courts adopting a broad definition of the term 'employer' have done so based on the significant remedial public policy underlying the anti-discrimination laws"; noting also, that, "While we support this reasoning, we also are mindful [of the 'economic' and 'democratic' purposes of limited liability] . . . .") (citations omitted). The federal civil rights laws lend themselves to the accomplishment of substantial justice through disapproval of acts which are aimed at defeating the quasi-jurisdictional elements of suitors' causes of action. *See also Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 84–88 (3d Cir. 2003), *certiorari denied*, 541 U.S. 959 (2004) (in Title VII lawsuit, applying a different approach than the Fifth Circuit to determining whether companies were split by an employer in order to evade the law's employer numerosity requirement) [20]; *id.* at 87

---

[20]    In addition, the Court may wish to consider the approach adopted in tax cases. *See, e.g.*, *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction . . . . the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant . . . . To

18

("We adopt an intentionally open-ended inquiry – *which we consider one of federal common law* – to determine when substantively to consolidate two entities.") (emphasis added).[21]

At the very least, the Plaintiff should be given the opportunity to persuade the jury that Defendants denied, interfered with, or otherwise inhibited the exercise by the Plaintiff of her FMLA rights, <u>during</u> the term of her approved leave.[22]   In other words, the Plaintiff should be given the opportunity to persuade the jury that Defendants' official date of June 11, 2008, is a sham.   Therefore, the Court ought to deny the Defendants' motion for summary judgment upon Plaintiff's FMLA claim.

        *4.     The Defendants' demotion of the Plaintiff was not a mere* de minimis *interference with her FMLA-protected rights.*

For all of the foregoing reasons, the Defendants' contention that the April 2008 e-mail heralded a *de minimis* adjustment to the Plaintiff's job description should be rejected.   *See* Def. motion, at pp. 18–19, para. 36 (citing 29 C.F.R. § 825.215(f)).   Notwithstanding Defendants' strident assertions to the contrary, a reasonable juror could surely conclude that the April 21, 2008 supervisor assignment effectuated (or veiled

permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.").

[21]      As is discussed above, employee numerosity requirements are not jurisdictional.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 504 (2006); *Minard v. ITC Deltacom Communications, Inc.*, 447 F.3d 352 (5th Cir. 2006) (FMLA case).  Nor, for that matter, can it be said that inquiry into whether an FMLA claimant returned to work on time is properly characterized as jurisdictional.  The concept of subject matter jurisdiction is, after all, applied with excessive frequency.  *See Arbaugh*, 546 U.S. at 510 ("This Court, no less than other courts, has sometimes been profligate in its use of the term.").  Yet because the matter of an employee's timely return to work does not touch upon the constitutional source of authority for enactment of the FMLA (there is no difference, as far as the Commerce Clause or any other part of the Constitution is concerned, whether somebody takes eight weeks of leave or fifteen), it is not wise to describe it as jurisdictional.  *Accord Nesbit*, 347 F.3d at 79–80 (discussion about the dichotomy characterizing the issue of whether an element of a claim goes to the merits or is jurisdictional).

[22]      The Defendants' argument that Plaintiff cannot maintain an interference claim because she "took twelve weeks of leave, and then some," is unconvincing.  *See* Def. motion, at p. 18, para. 35.  Nobody needs the Act in order to take a sabbatical, unless her employer is a jailer.  The point of the Act is to protect the employee while she is away.  *See generally* 29 U.S.C. § 2614.  Hence, by demoting the Plaintiff while she was on leave, the Defendants interfered with the Plaintiff's exercise of her FMLA rights.  *See Throneberry v. McGhee Desha County Hospital*, 403 F.3d 972, 977–79 (8th Cir. 2005).

latent yet no less real) changes to the Plaintiff's compensation level, job description, and supervisory/managerial responsibilities.

Put simply, the April 21, 2008 e-mail raises a fact question about whether the Plaintiff, by operation of said e-mail, had been stripped of her supervisory duty.  As aforementioned, the Defendants concede that Brent Fraser, the man who openly and notoriously became the Plaintiff's supervisor in April 2008, assumed <u>the Plaintiff's</u> supervisory responsibilities.  *See* Def. motion, at p. 13, para. 26 ("The record also reflects that no replacement was hired for Plaintiff **and her supervisory responsibilities were absorbed by the Operations Manager, Mr. Brent Fraser,**") (citation omitted) (emphasis added).  And, the Defendants' April 2008 Inspection Group organizational chart, when compared with the October 2006 chart, aptly demonstrates that, by April 2008, Plaintiff was no longer a supervisor.  *Compare* Ex. F, *with* Ex. G.

No doubt, the elimination of Plaintiff's supervisory duty is in and of itself sufficient to constitute a judicially cognizable interference with the Plaintiff's FMLA rights.  Federal regulations provide that an "equivalent" alternative job position, under the FMLA, must carry with it the same, or a "substantially similar," level of "responsibilities," as well as the same, or a "substantially equivalent," level of "effort, responsibility, and authority."  *See* 29 C.F.R. § 825.215(a) ("An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits, and working conditions, including privileges, perquisites and status.  It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.").

What happened in April 2008, as to the Plaintiff, was not *de minimis*.  Liability is established because Defendants surreptitiously demoted the Plaintiff in April, during the period of her approved leave.  Defendants' motion on the FMLA claim must be denied.

B.      Plaintiff's Title VII Discrimination Claim Is Viable.

The Court should not dismiss the Plaintiff's discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., as amended, 78 Stat. 253. The Plaintiff has succeeded in making out a prima facie case of pregnancy discrimination.  That is, the evidence of record raises genuine issues of material fact regarding whether, in demoting the Plaintiff, Defendant Oceaneering was partially motivated by her pregnancy.  *See* 42 U.S.C. § 2000e-2(a)(1).[23]  Where direct evidence of discrimination is unavailable, proof of discrimination, sufficient to permit the jury to infer the existence of the same, is generally governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (laying out the general elements of a plaintiff's prima facie case).   The elements of the burden-shifting framework, however, should not and need not be rigidly construed or applied in all cases—particularly where good cause exists for varying them.  *See id.* at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").[24]  Defendants, for example, would have the Court require that the Plaintiff demonstrate she was replaced by another Oceaneering employee.  Def.

---

[23]      Mr. Finlay is only an FMLA Defendant.
[24]      *See also Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575–76 (1978) ("[*McDonnell Douglas* prima face guideline] was not intended to be an inflexible rule . . . [b]ut *McDonnell Douglas* did make clear that a Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act'") (citations omitted).

motion, at p. 13, para. 25.  This showing should not be required under the facts of Plaintiff's case—especially since, as the foregoing evidence suggests, the creation and manipulation of job titles was the prerogative of one man, Pierce Finlay.[25]  The Plaintiff can show, and the evidence discussed above demonstrates: (1) that Mr. Finlay made a negative comment to her face about her pregnancy, and that he sent her a sexually explicit e-mail;[26] (2) that Mr. Finlay demoted her during her leave of absence (or, upon her return to work); and, (3) that Oceaneering's justification for demoting her is contradictory and pre-textual.

Assuming the Court nevertheless does require the Plaintiff to prove that she was actually replaced, Plaintiff can do so for two reasons.  First, a reasonable juror could conclude that Plaintiff was replaced by Brent Fraser, who, in April 2008, assumed supervisory responsibility over her and "all the data processing clerks and seniors."  *See* Ex. E, Hardaway depo., at p. 27:3–22; Ex. B, Finlay depo., at p. 38:7–14; Def. motion, at p. 13, para. 26 ("The record also reflects that no replacement was hired for Plaintiff **and her supervisory responsibilities were absorbed by the Operations Manager, Mr. Brent Fraser.**") (citation omitted) (emphasis added).   Second, a reasonable jury could conclude that four new full-time employees were hired to help shoulder Plaintiff's previous non-supervisory functions:

> Q.    [TONJA KING] Okay.  You also understand that the reason
>        Oceaneering told you that your position had been eliminated was
>        cost savings initiatives, right?

---

[25]    *Accord* Ex. A., Starr depo., at p. 119 :14–16 (conceding that position was eliminated "in writing," but stating that Julie Rowe Garcia received "the exact same responsibilities as I had when I left").

[26]    Plaintiff's evidence of animus is legally sufficient because Mr. Finlay was her supervisor, and the offending comments which he allegedly made were directly aimed at her.  *Cf. Spears v. UTI Patterson Drilling Co.*, 2009 WL 2134601 (5th Cir. 2009) (not selected for publication) ("The only comment that is attributable to the decisionmaker in this case is Gallegos' statement that he no longer harbors racial animus towards African-Americans.  This statement is simply insufficient to raise a genuine issue of material fact as to pretext for discrimination because it is vague and only demonstrates past, if any, animus.").

A.     [SHARON STARR] Pierce Finlay did say that upon my return. But I also asked him, if they were cutting back in costs, why, since I had been out, did they hire four full-time employees?  And he said, "We're not here to discuss them.  We're here to discuss you and you not having your position anymore."

Q.     Okay.  What four full-time employees were you referring to?

A.     The four new ones that were in our office –

Q.     And –

A.     – when I returned.

Q.     Which department?

A.     Data entry.

Q.     How much were each of them making?

A.     That's not for me to know.

Q.     Okay.  So it's highly possible that two of them at $19 an hour could have been hired for the salary that they were paying you at [$]55,000, right?

*See* Starr depo., at pp. 131:25–132:15.[27]

It is equally important to reiterate that the evidence, discussed in part A(3), raises a fact issue regarding whether the cost-cutting defense is pre-textual. *See, e.g.*, Ex. B, Finlay depo., at p. 36:10–21.  A reasonable jury could conclude that there was no bona fide cost-cutting at Oceaneering—or, that the existence of an informal cost-cutting initiative is being bandied to cover over the Plaintiff's demotion.  *Accord Reeves*, 530 U.S., at 147 ("Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, <u>especially since the employer is in the best position to put forth the actual reason for its decision</u>.") (citing *Furnco*, 438 U.S., at 577) (emphasis added).

---

[27]     In his deposition, Mr. Finlay testified that he had "promoted four girls, four women to senior data processors . . . [t]hese were Mia Goodwin, Amanda Orick, Lisa Finlay.  And I'm not quite sure if Julie Rowe was a senior processor or not."  *See* Finlay depo., at p. 39:4–14.  Mr. Finlay explained that "[a] senior processor is like a lead technician.  They know everything about the job and all aspects of it."  *See id.*, at p. 39:15–19.  Mr. Finlay testified that he promoted the women prior to the period of Starr's FMLA leave.  *See id.*, at p. 39:7.  He was uncertain about whether he effectuated the promotions in 2007 or 2008 (he thought he promoted the women in 2007).  *See id.*, at pp. 39:22–40:7.

23

The Plaintiff has both established a prima facie case of pregnancy discrimination, and she has demonstrated that Defendant's justification for her demotion is pre-textual. Summary judgment on Plaintiff's Title VII claim is improper.

C.      The Plaintiff's Retaliation Claims Are Viable.

The Defendants cite to no admissible evidence, other than the Plaintiff's EEOC charge, in support of their contention that the Plaintiff's retaliation claims should be dismissed.[28]  The Plaintiff's retaliation claims are viable because, from the facts recited *supra* (i.e., the facts undergirding the Plaintiff's prima facie case), a reasonable juror could conclude that the Defendants sought to edge the Plaintiff out, partly on account of her having filed an EEOC charge in June 2008.[29]

The Plaintiff's FMLA retaliation claim is not vulnerable to the Defendants' exhaustion argument.  The Plaintiff's Title VII retaliation claim should not be dismissed because, as Defendants acknowledge, Plaintiff alleged retaliation.  *See* Def. motion, at p. 20, n. 98.  Fair notice should not require that she have amended her charge after being fired, to reemphasize the point.

---

[28]      Defendants cite to the EEOC charge, a June 19, 2009 personnel status change report, and a termination form.  *See* Def. motion, at p. 19, para. 37, nn. 96–97.  The latter pair of documents consist of inadmissible hearsay, unaccompanied by a properly executed business records affidavit.

[29]      The Fifth Circuit has specified that, under Title VII, the "causal link required in prong three of the prima facie case for retaliation is not as stringent as the but for standard."  *See Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002) (citation omitted) (internal quotation marks omitted). Plaintiff will concede that she has no independent evidence of retaliation beyond the fact of having being fired.  *Cf. id.*, at 472 (overruling retaliation claim by suitor whose Title VII and 42 U.S.C. § 1981 discrimination claims were properly dismissed under Fed. R. Civ. Pro. R. 50; stating: "Other than the five month time period [between the filing of the lawsuit and the suitor's unsuccessful attempt at being rehired], Raggs has presented no evidence of retaliation.").  Because the Plaintiff's FMLA and Title VII claims are valid, however, dismissal of her retaliation claim is inappropriate.  *Accord Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) ("We note that a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes.") (citations omitted) (internal quotation marks omitted).

D.      The Court Should Not Decree that Plaintiff Has Failed to Mitigate Her Damages.

        Lastly, the Court should not hold, on summary judgment, that the Plaintiff has

failed to mitigate her damages (and that she is therefore ineligible for front pay or back

pay under Title VII).  *See* Def. motion, at pp. 20–21.  The Defendants' argument that

Plaintiff has not looked for work on the advice of her attorneys, reads too much into Dr.

Gandhi's patient summary.  The summary states that "2 different attorney's have advised

her not to <u>go back</u> to work."  *See* Def. ex. BB (entry for October 30, 2008) (emphasis

added).[30]  This does not have to mean that two attorneys told the Plaintiff not to look for

work at all (as opposed to returning to the hostile Oceaneering environment).  Regardless,

the same patient summary indicates that the Plaintiff refrained from looking for work due

to stress.  *See id.* (". . . complains that if she gets to thinking about working somewhere

else 'she feels that she'll be mistreated again and doesn't want to even start working

again'") (entry for August 5, 2009); *id.* (entry for September 16, 2009).  Plaintiff testified

that she has not sought alternate employment due to overwhelming stress, arising from

the facts made the basis of this lawsuit.  *See* Starr deposition, at pp. 161:1–162:16.  For

summary judgment purposes, that is enough.[31]

CONCLUSION AND PRAYER

        Wherefore, premises considered, the Plaintiff, Sharon Starr, prays that the Court

deny the Defendants' motion for summary judgment.

---

[30]     Plaintiff invokes the attorney-client privilege and objects to the admissibility of all evidence (Dr. Gandhi's medical records and testimony) implicating Plaintiff's disclosure to her treating psychiatrist, of advice received from her attorneys.  *See* MUELLER AND KIRKPATRICK, FEDERAL EVIDENCE 3d section 5:18 (3d ed. 2007 & Supp. 2009), at 562 (commentary on privileged disclosure).
[31]     That the Plaintiff testified she would take her old job back, does not undermine the rest of her testimony.  *Cf.* Def. motion, at p. 22, para. 43.  The loss of the job—and the attendant, alleged civil rights violations by Defendants—is, after all, the impetus for this lawsuit (in which the Plaintiff possessed—yet, through counsel, declined—the option to plead for reinstatement, *see generally* Docket 18).

25

Respectfully submitted,

Date:   December 24, 2009                          /s/ Matthew Nickson

_____

Matthew Paul Nickson
SBN 24056043
S.D. Tex. No. 704796
1300 McGowen
Houston, Texas  77004
Tel.: (713) 655-8880
Fax: (713) 655-0405
***Attorney-in-Charge for Plaintiff***

<u>**CERTIFICATE OF SERVICE**</u>

I, Matthew Paul Nickson, hereby certify that on December 24, 2009, a true and correct copy of the foregoing document and of its attachments were served by ECF upon the following counsel of record.  Further, counsel certifies that a paper, courtesy copy of the document and attachments shall be delivered to the Court's chambers.


Mr. Laurence Stuart
Ms. Tonja Kirkland King
STUART AND ASSOCIATES, P.C.
Two Houston Center
909 Fannin, Suite 3250
Houston, Texas 77010
***Attorneys for Defendants***


/s/ Matthew Nickson

_____
Matthew Nickson